For the defense, could both sides, both attorneys, please approach the podium and tell us who you are and who you represent. Jessica Arizo on behalf of Joseph Martinez. Assistant State's Attorney Peter Maltese on behalf of the people. I'm sorry everybody left because I'm sure these will be wonderful arguments. It's their loss. Okay, each side has 15 minutes, but as you can see, the last one took almost an hour. As long as you're interested, we'll let you talk. But it does behoove you to get to your strongest point first because we have read the briefs and the case law and the pertinent portions of the record. So anytime you're ready, Ms. Arizo. May it please the Court? This is a case about judicial bias. Joseph Martinez and Valerie Payden were both charged with the first degree murder of Valerie's son. The judge in this case first found Valerie Payden guilty of only child endangerment. The reason being that he found that she, quote, brought the beast into the house. The beast being Mr. Martinez. So that case actually went to a full trial, right? It was not, she's not a flipper, the state didn't give her a break, it was a, were they tried together? No, it was a separate trial, it was a bench trial with the same judge. But at the same time? Or no? No, no, they were about a year, a little over a year apart I believe. Okay, so her first? Yes. And then after finding, after labeling Mr. Martinez a beast, then in this trial, when the state twice told the jury that Payden, quote, had let the beast back into the building, the judge overruled these objections. Now this shows judicial bias, which infected the trial and the jury's deliberations. I didn't see that in your brief at all. I mean, having read the briefs, I didn't pick up that you were, I thought that Judge Egan was biased against your client. Well, certainly, we raised the issue that he should have recused himself due to bias against the defendant. Okay, go ahead. Yes, I argue that not only had he labeled the defendant a beast during this. Oh, I see. During the co-defendant's sentencing hearing, he also had found, because they were both charged with the same thing, he had found that of the two people that could have possibly committed this crime, it was not Valerie Payden, and thus made a finding that it must have been Mr. Martinez who committed this crime, and Payden only was guilty of letting this beast into the building. Now, calling the defendant a beast shows not only that he was biased against Mr. Martinez, it's also carried over into trial where the rulings that he made showed that he had a bias against Mr. Martinez. As I stated a few moments ago, the state's attorney, using almost the exact same language that the judge had used, this was the same state's attorney that had been present and had prosecuted Ms. Payden, used almost the exact same phraseology that the judge had used, possibly knowing that, of course, the judge would allow this commentary, given that the judge himself had used this harsh term. In this case, this case was tried, though, to the jury as a whodunit, is that right, that the argument of your client at that time was that the wife did it, or the living girlfriend, the mother, The question for the jury was who had done it among the two parents, right? And so, in this case, your client's lawyer had called an expert witness, Dr. Spitz, to testify. He's a pathologist, and he did lots of exams, and he reviewed the records in this case, correct? And Dr. Spitz was offered for the purpose of testifying that the mother, even though she was six months pregnant, would have had the physical capacity to beat this victim to death, and the incredible amount of force used could be done even by a six-month pregnant female. Is that right? Right, right. That expert was to counter the state's expert who said that no pregnant woman five or six months pregnant could have committed this crime. Dr. Jones' testimony. Right, even though At the same time that Dr. Spitz did not testify in any way that these horrendous injuries would be consistent with an accident or with a reckless act, did he? No, no, he did not. So, and at the same time, Judge Egan, this guy who saves precious, allowed the defense attorney to argue to the jury that they could believe that these acts amounted to recklessness, even though there's no evidence in the record that there was any reckless act committed. Is that right? Well, the reckless act that the defense was arguing was that all Mr. Martinez had done was taken the child and squeezed him in a bear hug, as he had been taught by the doctor that had seen the boy, and then pushed him up against the wall. And the argument was that that was all the criminal act he had done, was this reckless behavior. Maybe he went too far in the way that he restrained the child. Right, well, at page 12 of your brief, it reads, it said that a bear hug could not have caused the injuries that happened to the decedent. As a result, the defendant's statement to the police is not a confession and does not implicate the defendant in the death, where the death was caused by multiple injuries due to blunt trauma. Right? Right. So you're saying then, right, that that sentence reads in English, would be that whoever did this beat this child horribly to death, horribly to death. It's multiple blunt injuries. Since my guy says all you do is hug the kid and bump against the wall, clearly that didn't do it. Right. Right? Right. So what evidence was there then of recklessness in this case? Well, the jury may have believed that the acts that the defendant did commit perhaps may have pushed over the child, you know, given the timeline. The child could have received injuries earlier in the day. We have no way of knowing what time the injuries were committed. The medical examiner has no idea what the time of death was. Well, you would know it would be no time. These are not old, old injuries. Oh, no. So it's not like you're right. I mean, there was one spiral fracture, I thought. Right. But all the rest were fresh. Right. It was sometime that day, that afternoon. Right. But given that Valerie was home with the child alone, the jury may have thought that she committed these acts, and maybe the hugging of the child, because there were internal injuries, maybe that reckless act pushed him over to the point that it caused his death. Okay. That was the theory, I believe, that the jury may have. I hadn't thought of that. So, no, that makes sense. Along with allowing the jury to also, I mean, sorry, allowing the state to also label the defendant a beast twice over objection, the judge also made some other questionable rulings in this case that show a bias. For example, allowing the state to misstate the law of involuntary manslaughter. Now, the state basically told the jury that, to give them an example of what involuntary manslaughter was, said, involuntary manslaughter applies when you're cleaning out a gun, and the gun accidentally goes off. But he didn't say it only applies, right? No, no. He was giving this as an example of involuntary manslaughter. It did not. It involved shooting somebody. Right. But also using the word accident, right? Yes. The state didn't say it only applies in this situation, but they also didn't give any other examples. The only example they gave, which in their own words was accidentally, something accidentally happens. And involuntary manslaughter can be unlawful or an unlawful act. And this may have caused the jury to see involuntary manslaughter as a more narrow, accidental situation. So if we were to agree with you, though, we should then write an opinion to tell everybody what else to do, and we should tell them when a party is going to mention it as an example of something, to set it aside, to distinguish it, they must mention more than one example, or how should we write that? Well, the state should say an example of involuntary manslaughter would be. The way that it was phrased here made it sound like involuntary manslaughter applies when you're cleaning out a gun, and it's an accident. They could say an example of. And obviously it would have been better if the state had given another example of a reckless situation in an unlawful capacity. But the fact that they said it applies in this situation without other examples, like I said, narrowed the focus. Counsel, isn't it what the problem in this case is? They gave an example, and, yes, this Court, I agree, it wasn't the best example they could have given. But that isn't the real key point. The key point is that then the jury has a question and states later on, hey, we got a problem with trying to figure out what happened here, whether it was murder or involuntary. Right. That's why it moved so big. Right. That's definitely an obvious showing of prejudice as a result of this comment. The jury said to the judge, we're not sure what's going on here. We're struggling. Is this first degree? Is this involuntary manslaughter? We don't know, you know, possibly in large part because the state confused them with this accidental language. But then, counsel, to take you back to Justice Quinn's earlier question, earlier comment, but the medical examiner said this didn't happen from a bear hug. Right. And so this whole emphasis that your client said, well, maybe, you know, something happened where, you know, I gave him a bear hug and maybe that caused it. I mean, there's no evidence that would even support an involuntary manslaughter. Well, I mean, certainly the jury was considering it heavily, or they wouldn't have, you know, raised that issue. Well, certainly, perhaps one, right? Pardon me? We have no idea how many. Somebody was considering it. Right. At least one, right. At least one person had to have been seriously considering this. But we're going back to Justice Coleman's question. You cite Wheeler in a fairly recent case from the Supreme Court on closing arguments. Lisa, I think you do. And so reading a statement from Wheeler, if the jury could have reached a contrary verdict, in this case, if the jury could have reached a verdict of involuntary manslaughter, had the improper remarks not been made, or the reviewing court cannot say that the prosecutor's improper remarks did not contribute to the defendant's conviction, a new trial should be granted. So the question is, how could any rational jury, any rational jury, have found this to be involuntary manslaughter? Well, as I said earlier, you know, the jury may have believed that the acts that he committed, you know, led to his death because of, you know, injuries he had already sustained at the expense of the mother. And would he be accountable for those as a result of his participating? Well, it would have been separate. I mean, it would have been separate related incidents because they weren't together at the same time. Did the defense ask for an accountability instruction? No. Did the state ask for an accountability instruction? No. And his acts were reckless, and they weren't intentional. Well, whoever killed him, there was nothing reckless at all. This child was tortured to death, beaten to death in a horrible, horrible manner. And so it was tried in front of the jury as a whodunit, with the state saying it was the stepdad, if you want to call him that, the male, the defendant. And the defendant saying, no, no, no, it was the mom. Right? Right. And again, like the last case, kind of a stark contrast. Those are the two choices presented to the jury. Defendant did it or mom did it? And they came back and said, he did it. Right. Right. And we would argue that maybe they would have found differently had the ruling that the judge made throughout this trial been different, if he had, you know, recused himself at the beginning or if he, in fact, made proper rulings throughout the trial. Because every ruling that he makes, although he is not the trier of fact, does lead to the jury's verdict. And these were crucial mistakes that he made throughout the trial. But, again, the facts don't support in any way, manner, or form an involuntary manslaughter verdict. Again, I understand the judge would let it be argued because he doesn't want to have, because if he didn't let it, he'd be saying it in front of us today, and not just you, it's your job. A defense jury would be saying it in front of the public court today saying, well, he was certainly erroneous for not letting us argue to the jury an involuntary manslaughter. And the judge knows that. He's been around a long time. And so he says, no, go ahead, knock yourself out. And the jury rejected it. That's correct. But, again, the jury was given this improper information about what involuntary manslaughter was. And, again, we have no way of knowing what their ruling was. Well, the very next sentence after the objection, after your, and this is at page 23 of the blue brief. So he says about shooting, that's involuntary manslaughter, the gunshot. Objection overruled. The next sentence. If you find that he didn't really mean to kill Michael, but that his actions were intentional in inflicting these injuries, it's first-degree murder as long as he knew that those acts create a strong probability of, at the very least, great bodily harm. That's a correct statement of laws, isn't it? Yes, it is. So a sentence later, after his bad analogy, or you would say an incorrect analogy, he gives the dead-on legal definition. But we know that the jury, during their deliberations, was discussing this very issue. So it wasn't as though that cured any sort of question in their minds about whether this was involuntary manslaughter. They were discussing this at length so far as, you know, two days, a day and a half of deliberations to the point where they said they were at an impasse over this very issue. So the fact that the state then didn't make that second statement doesn't necessarily prove that the jury wasn't confused by his initial statement. But the initial statement is not an erroneous statement of law. It's not an instruction either. It's just argument. And, well, again, it's an example. And, again, you say that an example of a shooting is different than a beating death, which took a very long time in all likelihood. I mean, an incredible amount of force as opposed to, oops, pulling a trigger. It is just that. It is not an instruction. And it is correct. When he said an example of an involuntary manslaughter, he didn't use the word example. When he says an involuntary manslaughter, well, that's when you accidentally shoot somebody. And there are three cases cited in the state briefing. By the way, actually, courts of review have held that when a defendant asserts he accidentally shot somebody, that could sustain an instruction and a verdict for involuntary manslaughter. Well, I mean, the state's cases had more facts than just an accidental. Right. But now we're picking on analogies to the point where, well, but in those other cases where the ASA is using the analogy. Right. You know, without citing those cases, ah-ha, we can find cases that don't exactly agree with that. Is that what argument is? Is that the whole purpose of it? No. That we should reverse based on, you know, a case that doesn't involve here at all because it's not a very good analogy? Well, hold on. Right. No, I'm just saying that the fact that, you know, saying it's an accident is different than saying the person acted recklessly. The term of the accident, using the word accident, may have very well confused the jury. Can I ask? Okay. It confused the jury even though there was nothing in the facts that would show any type of accident here. Well, if they believed that his statement to the police of the acts that he did and they believed that the child was injured previously and this led to his ultimate death, you know, that's something the jury very well could have believed. Did they argue that, though? Did the defense attorney argue that? I don't believe he did. Okay. Well, that's, I mean, you know, so they always say, you know, especially in the appellate court, I'd say it's 20-20 to say, ah, here's an argument they could have had. Yeah, that is an argument they could have had. They didn't want that argument for whatever reason. The trial guy, the trial person, lady, seeing this case said, I'm going to go with it's mine. And they were right to do that. Right. But the jury very, I mean, we don't know obviously what the jury was considering when they were debating the issue. My point is, though, they weren't deprived of agreeing with the defense attorney based on the faulty argument of the state. If the defense attorney did not argue in any way that this was reckless, he heard it all. The defendant's not damaged at all. Nobody thought it was reckless. Not a soul. I'm sorry, can you repeat the question? Sure. I'm sorry, I talk fast. If the defense attorney at trial did not argue that the jury should find him guilty of only involuntary, first, not guilty, he didn't do it. Right. But if they believe his statement, that he only bare-hugged the kid, in agreeing with your argument, which is a very good argument, that if he only hugged the kid after the child is already horribly abused by mom, you could return a verdict of involuntary manslaughter. Basically, that's a reckless act. Right. But if he didn't argue that, and I bet he didn't, and I'm saying this because I think it would be in the briefs, if he didn't argue that, then in no way is your client harmed by the state's argument that what the defendant did here was not reckless, because it was not asserted by the defendant at trial it was reckless. If that's not his business in there, he really shouldn't be, meaning no criticism of you at your job, to say up here it could be reckless. You know, we never argued with the jury. We didn't think it was reckless. We thought it was mom. The kid died a horrible death. But now you have a good theory, an excellent theory, but that wasn't presented. I want to clarify what I said earlier. That wasn't the theory argued, but the defense did argue for the involuntary manslaughter instruction and asked for that to be given. In fact, right? I mean at the instruction conference. Right, right, right. So that, you know, that there was that assertion that it could have been a reckless act given his statement. But they did not argue the theory that I argued. Right, but in case a juror like you came up with that theory, right? I mean, I hope that a juror would come up with a theory. By the way, you know, maybe all he did was hug the kid, and maybe mom did do it a lot more than he did. It's all you involved. Exactly right. But when they don't argue it, then you're just, it's lightning in a bottle. Like, well, what's the complaint that, you know, that somehow this jury was misled by a state's argument, which addressed a non-argument by the defense? Well, I mean, the state, I mean, sorry, the defense was putting forward to the jury the option to find that it was reckless. So then the judge allowed the instruction to be given. But, you know, so even if the defense did not argue my theory that I presented, they were, you know, giving the instruction. So the jury did need to deliberate about whether or not this was reckless or not, or if it was first-degree murder. So the statement by the state's attorney was improper because this was part of their deliberation, because this was something they needed to consider, whether it was reckless or if it was first-degree murder. Right. So they had, you would agree, they had to address it, they correctly addressed it in closing involuntary, even though it was argued by the defense. They still had to, I mean, it's their burden. They've got to prove beyond a reasonable doubt first degree to the exclusion of involuntary. So they had to do that. They had to say something. Again, we can all say it was a bad analogy. It's dramatically different pulling a trigger and beating somebody, crushing a child. Right. I just wanted to bring up one other issue if I have time. Sure. That the judge also here improperly did not give the jury, I'm sorry, he improperly gave the jury the transcripts of the state's medical examiner, knowing full well that the defense examiner's transcript was unavailable due to the fact that it had not been prepared yet. What this led to was that although the jury then asked for the transcript of all of the witnesses, they were not given the transcript of this medical examiner. And whereas we've discussed the key here was this issue about whether Valerie Payden could have physically, as a five- to six-month pregnant woman, committed the acts that led to the death, this was key, key testimony where the defense witness said that she could. And not only that she could, but also talked about the adrenaline that comes from an act like this. And so basically in the deliberation room, the jury had all of the transcripts of all of the state's witnesses, including this witness. And some of the defense witnesses, but not this witness here, their doctor expert. But the jury was unavailable, right? It was unavailable. And the judge knew it was unavailable at the time that he gave the other transcript. And the defense objected for that reason. You know, it's going to give an unfair, biased impression to the jury to have one expert's transcript and not the other's. But the standard in our review on that is abuse of discretion, is that right? Yes. And in Fisher, the most recent case that we could find, I'm excited by one of you two, decisions on whether to grant a transcript request then must be based on such objective factors as whether the testimony is still fresh in the jury's minds. And it would be, because this is a very short trial. And the hardship of obtaining the requested material within a reasonable amount of time. And so you didn't have that. They weren't going to have the transcripts available. So absent an abuse of discretion, this Court will not disturb a decision. Well, our point is at the time he gave any transcripts, he knew that they were unavailable. So the decision, his discretion at that time should have not been to give, should have been to not give any, knowing that there would not be a balanced. Right. Can you cite a case, though, and I bet you can't, that has been held by a court of review that a trial court can only give the jurors what he has on hand. If he can't give them everything, he should give them nothing. I don't believe that happens. I'd be surprised. But if you do, let us know. But that's your argument, though, isn't it? Not that, you know, it would seem to be one-sided, and you're right. It would seem to be, you know, here's all the state's witnesses. You know, in this case it was all state witnesses plus all the prepared testimony, I mean typed up testimony from any defense witnesses. But I'd suggest that if that's our response in a court of review, to say when you can't give them everything, give them nothing, that's going to be a tough road at all. Well, it's certainly not in every situation, which we say, that, you know, don't give them anything unless you can give them everything. But here where the defense made a specific objection that, hey, you give them this expert and you don't have our expert, this is going to create an unfair balance. But, again, the defense expert was it was Matt. So, you know, in apparently jury, no crime deciding was murder. Rather, it was one of them. The question was how bad was it, was the hang-up. Well, we have no way of knowing how they got to that point. And maybe because they didn't have the testimony that said that Valerie Payton could have committed the act to look over, maybe that's why they, that was their line of thinking. The testimony indicated that this child was not only injured by a hug, but also there was blood trauma to the head, neck, all over the body. Almost every vital organ had damage to it. Correct. So whoever did it, the jury then, I guess, believed or it was believed that Martinez did this. But whoever did it, since the injury was so severe all over this child's body, would a jury ever come up and say or tell me how you feel that the jury would say it was involuntary manslaughter with all of these injuries and this child's death being attributed to all the damage that was done to this child? Well, the jury could have, I mean, they weren't tasked with judging Payton's guilt. So if they felt that she was responsible and had committed the more brutal of the acts, and that my client, as I stated earlier, perhaps the spare hug pushed the child past a certain point where the injuries, you know, resulted in his death or something similar to that, the jury could have found then that it was involuntary manslaughter. Given, you know, that the defense did argue that she had access to the child without him present. You know, she was alone with him as well. Her testimony was impeached about when she checked on him. So if the jury felt that she had done the more, you know, the acts that you had described, they could have found that the acts that Martinez committed were only reckless. That would be our argument. If there are no further questions, we would just ask that Mr. Martinez receive a new trial. Thank you. Thank you. Mr. Maltese. May it please the Court, Assistant State's Attorney Peter Maltese on behalf of the people. Defendant in this case was proven guilty beyond a reasonable doubt after receiving a fair trial. This Court is required to look at the evidence in the most, and like most favorable to the prosecution, and must not reverse unless it finds no rational jury could have found the defendant guilty. However, the jury was rational, and the evidence shows that the defendant had the opportunity, the defendant had the motive, the defendant had the ability, and the defendant had a long history of reacting violently when he became angry. The disparity between the sizes and the strength of 5-year-old Michael, who weighed only approximately 47 pounds, and the defendant who weighed 320 pounds, 6 feet, 8 inches tall, and the extreme injury suffered by this child demonstrates a deliberate use of force. Michael's lungs, heart, and liver were bruised on both sides, showing the amount of force used. All of his vital organs, except for his left kidney and adrenal gland, had evidence of injury. There was 43 distinct blunt injuries to his body. Mr. Maltese, wasn't it also interesting, you're emphasizing the size of the defendant and all of this force. There were no broken bones on this child. Wasn't somebody so huge sort of inflicting that kind of power on a kid? Nothing was broken. Wasn't that sort of unusual? I'm just curious. And that fact was brought up before the jury, and so the jury obviously knew that possibility. Children's bones are known to be flexible, and it was a fact that the jury certainly weighed. Again, this court is required to look at the facts most favorable to the people. The defendant had a motive. The mother told defendant the night before the murder that she was planning on leaving him, and she was planning on giving up their unborn child up for adoption. Defendant answered, because your child is ill, I can't have my son. Defendant was left alone throughout the day with the child. It's true that the mother was left briefly with the child towards the end of the day. However, during that period of time, the mother actually cooked the full meal and was caring for a nine-and-a-half-month-old child at the time. I'd also like to point out this new scenario which counsel brought to this court's attention that might justify an involuntary manslaughter, and this scenario that the child was first injured by the mother with these horrendous injuries and that the bear hug put him over the edge. The evidence is clear. Michael, throughout the day, was being very rambunctious, running around, allegedly dropping over DVD carts, swearing at his mother, doing all kinds of things. The only person saying that, though, was the mother, who was probably the most unreliable person I'd suggest on earth next to Mr. Martinez, right? Well, Mr. Martinez actually said that in his police statement hours after the child was found dead, that the child was acting up all day. He certainly didn't mention any extreme injuries, that somebody would have a bruised heart, bruised lungs, bruised liver, brain swelling, 300 cc's of blood in his abdomen, and that he would still feel the need to have to give the child a bear hug in order to calm the child down. The evidence, as this court has pointed out, in no way supports involuntary manslaughter. Additionally, counsel began her statement by saying this is a case of judicial bias. That wasn't even mentioned in the brief. Well, at the end it does. It is brought up in the brief in the sentencing part, but it does say that it's kind of late in the game, but it's in there. Well, the brief actually states that it's an appearance of bias, and then makes the improper statement that it's reversible based on the appearance of bias. None of the alleged judicial errors pointed out was brought out in the brief as being the results of biasness. Additionally, counsel, during the trial, the state's attorney referred to Mr. Martinez as a beast twice, and I guess in the trial before that with Valerie Hardin, the judge referred to whoever did this as a beast. Do you think that the state's attorney really exploited that, and do you think using the word beast is a word that you should ever use at a trial to refer to someone? Well, importantly in this case, the evidence supports the use of the old word beast. In fact, the jury was asked to make a finding of whether or not the actions were brutal and heinous, and both the judge in the prior trial and the ASA here was not pointing the finger at the defendant and saying he's a beast. It was said in the context of the responsibility that the mother had to take for allowing such a person in the home, and that's where the phrase is. Importantly, defense counsel acquiesced to the entire trial and sort of held this beast comment as kind of a trump card to see the results of the trial. Very early in the trial, in fact, before the trial began, on page NN4, defense counsel actually stated on the record that he had reviewed the trial of Valerie. Clearly the defense counsel had this beast comment in his head at all times and chose not to bring it before the court until sentencing, and then in sentencing only brought it up as a fact of the judge might have used some evidence in the sentencing hearing of Valerie in the defendant's sentencing hearing. There wasn't even an allegation of biasness in the trial on behalf of the trial court even then. Well, we can't reach plain error, right, even in the absence of objection if it's particularly bad. I mean, Blue teaches us that, if nothing else. Generally, why call him a beast? What's gained by saying that? The jurors know what he is. They know what he did. The issue is what did he do, and they decided that. It is not proper to call him a beast. All right. Move on. Okay. The defendant, regarding the trial issue, I'm sorry, regarding the transcript issue, it's important to note that the jury didn't ask for all the transcripts at the beginning. The jury asked specifically for the transcripts of the medical examiner, and the court inquired from the jury, well, who do you mean by the medical examiner, and they said Dr. Nancy Jones. And although defense counsel suggested it might be unfair to just give that transcript, the court noted they didn't ask for those transcripts. Counsel, the ultimate responsibility of what the jury gets back there is the judge's. The jury doesn't get to dictate what they want. When they want, the judge makes the ultimate decision as to what would be fair, what is proper for them to have. Is that correct? That's correct. And so, you know, the fact that the judge decided, well, I'm going to give you some of the transcripts, wouldn't it have been better for the judge to say we don't have all the transcripts here, and so, you know, jury, rely on the information you have? The important fact, however, is that Dr. Jones testified six days before the liberation. There was every reason to consider that the jury was actually struggling trying to remember her testimony. Dr. Spitz, on the other hand, had just completed testimony prior to the liberation, and the fact that they didn't ask for those shows that they clearly remembered his testimony. Is that what it shows? Or could it show, oh, we really want to hear what the state's witness had to say, and why do you automatically assume that it's just that they remembered very clearly what the more recent person said? Maybe they just wanted to emphasize something in the state's witness's testimony. Your Honor is correct. We don't know what the jury specifically was asking the reasons for the transcripts. However, as Justice Blanton ---- Counsel, it could have been that there was a juror back there who wanted to make a point, because he wanted a conviction, he or she wanted a conviction. They said, I need those state's transcripts, and I can point it out there. Then it would have been maybe good to have something from the other side saying, ah, yeah, but here it is, and they could compare them. I'm just saying that you don't just rely on what the jury wants. That's correct, Your Honor. Importantly, when the court asked ---- I'm sorry, when the jury asked for the remainder of the transcripts and they weren't available, the court informed the jury, we're giving you the transcripts we have. Some of them are being completed, and we're making inquiries regarding the remainder of the testimony, meaning the testimony from now on the second day of deliberation. The jury continued to send questions to the court, and the court, interesting enough, when the court asked, when the jury asked the court the final question regarding the definition of bodily harm, great bodily harm, they could have made inquiries of, well, how are those transcripts coming? Can we expect the transcripts? At that point in time, they informed the court, we've made a decision regarding guilt. It's only as to the charge. And Dr. Spritz's testimony only went towards the whodunit question. My point is that they had initially asked for them. However, they were able to reach a verdict without them. And surely there's nothing to support counsel's current insinuation that the judge's decisions on the transcripts were based on some sort of bias. I would propose that it would be a very bad precedent for this court to allow defense counsel to sit on a magic trump card of the beast in a co-defendant when counsel clearly should have known, and the record supports that counsel knew that this comment was out there and never brought it to the court's decision until well after the trial and virtually on appeal. The evidence, once again, was very strong in this case. This is not a closed case. And for the reasons stated in our brief and the arguments presented today in court, we would ask this court to affirm defendant's conviction and defendant's sentence. Thank you. Ms. Rizzo, very briefly. First of all, I would like to say that no defendant should be called a beast. And I appreciate the court has recognized that this is improper. As far as the defense counsel holding this as some sort of trump card, there's no evidence in the record that he read the sentencing hearing. Now, this took place on a different day than the trial. There's no reason to explain why defense counsel would review the sentencing hearing. You know, he would review the trial to see the evidence presented against her as well as the testimony. But there's no showing that he knew about this beast comment in the sentencing. And as soon as he knew about it, he brought it up in the motion to reconsider sentence. Also, I'd like to point out that this beast comment also could have, you know, been something that when the jury is trying to figure out between involuntary and first degree, if they have the state's attorney and the judge essentially agreeing with the state's attorney that this man is a beast, this is more likely going to encourage them to find it's a case of first degree murder. Regarding the transcript issue, the state argues that perhaps the testimony of the first doctor was too long ago that the jury didn't remember it. But then how do you explain that the next day they asked for all the transcripts? So maybe then they weren't remembering the testimony of the defense expert either. They asked for transcripts to get the holdout to cave in. I'm sorry. That's why jurors do that. Jurors ask for transcripts to get the holdout to cave in. That's how it works. Well, we don't know. I mean, we don't know exactly what their reasoning was. But clearly they didn't remember it enough that they needed that transcript as well. So I'd like to again conclude by saying that Mr. Martinez should be awarded a new trial. Thank you. Thank you. Thank you for the arguments and the briefs.